UNITED STATES DISCTRICT COURT
For the EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**COSZETTA STEELE,**
**Next Friend for Minor AW,**
    **Plaintiff,**

v.

**WILDWOOD APARTMENTS LLC, and**
**WILDWOOD PROPERTIES, LLC,**
    **Defendants.**

Case No.:  20 – cv - 10507

Hon.:

___

Collin H. Nyeholt (P74132)
LAW OFFICES OF
CASEY D. CONKLIN, PLC
Attorneys for the Plaintiff
4084 Okemos Road, Ste. B
Okemos, MI  48864
(517) 522-2550
(517) 227-5866 (Fax)
collin@caseydconklin.com

___

**VERIFIED COMPLAINT and JURY DEMAND**
___

There is presently no pending or resolved civil claim between the parties to this suit related to the events described herein.

1

## STATEMENT OF THE CASE

The Plaintiff, minor AW, was barely three months old when she and her mother Coszetta moved into a property owned by the Defendants, 207 2nd Street in Jackson, Michigan. The property was so completely blighted with lead paint and dust that the soil outside tested positive for dangerous levels of lead. The Defendants put their desire for profit ahead of AW's wellbeing and allowed her, and her mother, to reside in this brownfield site. Not surprisingly, AW suffered lead toxicity and has since developed a host of physical and developmental impairments. She brings this lawsuit in an attempt to remedy the lifelong damages she will suffer as a result of the Defendants' negligent actions.

## STATEMENT OF JURISDICTION

1. Plaintiff AW is, and at the time of the events in this complaint was, a resident of Jackson County, which is within the Easter District of the State of Michigan. Her biological mother, Coszetta Steele, has been duly appointed as the Conservator and Personal Representative for her Estate by the Probate Court for the County of Jackson, for purposes of prosecuting this claim.

2. Defendant WILDWOOD APARTMENTS LLC is, or at the time of the events described in this complaint was, a for-profit business entity organized under Michigan law.

3. Defendant WILDWOOD PROPERTIES, LLC is, upon information and belief, a for-profit business entity organized under Michigan law or an assumed name for same in existence at the time of the events described in this complaint.

4. The events giving rise to this complaint occurred in the County of Jackson at a property owned, managed, and controlled by the Defendants therein.

5. The Court may exercise *general in personem* jurisdiction over the Defendants because of their systematic and continuous direction of business activities into, and permanent business presence within, the County of Jackson which is within the Eastern District of Michigan. In the alternative, the Court may exercise *specific* jurisdiction over the claims alleged which resulted from an occurrence in the Eastern District of Michigan.

6. Venue is proper in Jackson County, and therefore the Eastern District of Michigan, because the Defendants may be found here, due to their respective residency and business presence, and because the events giving rise to this complaint occurred herein.

7. The Court may exercise *subject matter jurisdiction* over the claim for violation of federal law, 42 USC § 4852d, pursuant to 28 USC § 1331. The Court may exercise supplemental jurisdiction over the pendent state claims pursuant to 28 USC § 1367.

**COMMON ALLEGATIONS**

8. Plaintiff repeats and re-alleges the factual allegations and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

9. Plaintiff AW was born in July of 2009.

10. In or about November of 2009 Plaintiff AW, her mother Coszetta Steele, and her half-brother, minor LS, moved into Apartment 3 of 207 2nd Street (the subject property) in Jackson, Michigan. They remained in this residence until approximately November of 2011.

11. 207 2nd Street was at the time, and presumably still is, an older house that has been divided into multiple apartment units by the owner of the property.

12. 207 2nd Street was owned by Defendant Wildwood Apartments LLC during the term of AW and Coszetta Steele's tenancy.

3

13. Defendant Wildwood Properties, LLC was the owner, landlord, and/or apartment manager for 207 2nd Street at various times throughout the term of AW and Coszetta Steele's tenancy.

14. Defendants Wildwood Apartments LLC and Wildwood Properties exercised control and ownership of 207 2nd Street throughout the term of AW's tenancy. They received, directly or indirectly, rent and pecuniary benefit related to Steele and AW's tenancy at the property.

15. As of 2009, Defendants Wildwood Apartments LLC and/or Wildwood Properties employed an individual named Heather Moe as a property manager.

16. Heath Moe's duties for the Defendants included soliciting and entering into rental agreements, collecting rent and remuneration from tenants, and maintaining and inspecting rental properties owned and/or managed by Defendants, including 207 2nd Street.

17. Heather Moe spoke to Coszetta Steele prior to allowing her to move into 207 2nd Street. Moe was aware, because of this conversation, that Steele intended to allow then-2-month-old AW to occupy and reside in the space.

18. The rental documents that Coszetta Steele executed with Wildwood Properties particularly listed AW as one of the anticipated resident of the subject property. AW was, therefore, personally a party to the lease agreement for 207 2nd Street.

19. The Environmental Protection Agency uses the term "brownfield site" to refer to real property that contains a hazardous substance, pollutant, or contaminant which may hinder its intended use. 207 2nd Street was a lead-filled brownfield site.

20. Heather Moe was aware that there may be lead contamination in 207 2nd Street. And, she was aware that AW, a two month old, intended to occupy the property. She nevertheless allowed Mrs. Steele to lease and occupy the space with AW.

21. AW demonstrated early-life developmental delays and social disturbances.

22. Coszetta Steel paid rent to Wildwood Properties LLC at all times during her tenancy at 207 2nd Street.

23. In September of 2010, as part of her routine one-year medical exam, AW was tested for blood lead levels. The test revealed that she had an elevated blood lead level of 22 micrograms of lead per deciliter of venous blood (referred to hereafter as "µg/dL"). Subsequent tests on January 12th and June 27, 2011 indicated that she had blood lead levels of 16 µg/dL and 27 ug/dL, respectively.

24. The Department of Health and Human Services (DHHS) has determined that lead and lead compounds are reasonably anticipated to be human carcinogens and the EPA has determined that lead is a probable human carcinogen.

25. Young children under the age of five are particularly vulnerable to lead toxicity for a variety of reasons, including enhanced lead absorption and the fact that their body and brain are still developing.

26. The Centers for Disease Control and Prevention (CDC) considers a lead level of 10 µg/dL to be a level of concern for children and a new threshold of 5 µg/dL has been recommended.

27. Nervous system effects at even lower blood lead concentrations (5 µg/dL) in children have been shown to occur and include various psychomotor, cognitive and behavioral functional alterations. Studies have reported a 2 to 4-point IQ deficit for each µg/dL increase in blood lead within the range of 5-35 µg/dL. There does not appear to be a threshold for this effect.

28. The lead levels observed in AW, who was at the time less than two years of age, were sufficient to be correlated with life-long physical and mental impairments.

29. The Jackson County Health Department was alerted to AW's elevated lead levels.

30. Jackson County Health Department proceeded to perform a lead hazard assessment on 207 2nd Street on July 5 and August 8, 2011. It released its report on September 6, 2011. **Ex. A.**

31. This inspection revealed the presence of toxic levels of both intact and defective lead paint. Paint containing more than 0.50% lead by dry weight or above 1.0 mg per square cm of surface, including the dried paint film, as measured on site by x-ray fluorescence spectrum analyzer is considered hazardous. Sampling locations included various sites throughout the entire interior portion of the home. Various paint and dust wipe samples collected from interior and exterior locations at this residence were shown to contain elevated lead content.

32. Amanda's bedroom trough was reported at the highest concentration of lead and was found to be 38,000 µg /sq. ft.

33. The inspection revealed the presence of elevated lead in several locations in the interior and exterior of the house and determined that the presence of such lead-based paint constituted a health hazard.

34. Defendants were ordered to remedy the conditions and become fully compliant with the current Lead Based Paint Hazard Reduction Act.

35. A required lead abatement/hazard control plan was required to reduce potential future exposure of occupants to lead.

36. AW and her family moved out of 207 2nd Street in November of 2011. Thereafter, AW's observed blood lead levels began to lessen.

37. But, the damage was done.

38. The elevated blood lead concentration in AW is consistent with significant exposure to lead from a contaminated environment to a degree where it would be expected to cause neurotoxic damage.

39. AW has suffered, and continues to suffer, from poor hearing, brittle teeth (breaking off), poor vision, unable to focus attention, poor comprehension/impaired learning, poor physical coordination.

40. She has an increased risk of developing cancer later in life.

41. AW's intelligence has likely been impacted by her early-life lead exposure. As such, her ability to progress in school, receive an education, and receive a good paying job later in life have been impacted by the lead exposure.

42. Plaintiff anticipates expert testimony that will indicate that the contribution of other potential causal factors from her medical and family history is tenuous and that the lead exposure alone was sufficient to produce central nervous system injury. **Ex. B.**

### COUNT 1: VIOLATION OF THE RESIDENTIAL LEAD-BASED PAINT HAZARD REDUCTION ACT
*42 USC § 4852d*

43. Plaintiff repeats and re-alleges the factual statements and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

44. 42 USC § 4852d obligates lessors of residential property to disclose lead-based paint hazards to lessees prior to consummation of any lease agreement. They are particularly required to provide a lead hazard information pamphlet, as proscribed by the Environmental Protection Agency, to the lessee. 42 USC § 4852d. And, they are required to disclose any lead-based paint, or any known lead-based paint hazards, to the lessee. *Id.* Any person who knowingly violates the provisions of this section is jointly and severally liable to the lessee in an amount equal to 3 times the amount of damages incurred by such individual pursuant to 42 USC § 4852(b)(3), and costs and attorney's fees from the action pursuant to 42 USC § 4852(b)(4). A party may pursue

a claim for violation of this statute in conjunction with a state-law negligence claim. *See, eg Wallace v. US,* 335 F.Supp.2d 252 (D.R.I. 2004).

45. Plaintiff AW, a party to the lease agreement, was a lessee as contemplated by 42 USC § 4852d.

46. Defendants were lessors as contemplated by 42 USC § 4852d.

47. Defendants failed to provide Plaintiff with an appropriate pamphlet, disclosing the risks of lead based paint, prior to entering into her lease agreement for 207 2nd Street.

48. Defendants' failed to provide Plaintiff with the required pamphlet, knowing that alerting her to the particular risks attendant to living in a lead infested rental property may have caused her to rent elsewhere and, thus, placed their desire for profits ahead of her wellbeing and willfully omitted this information.

49. As a result of Defendants' willful failure to disclose, Plaintiff AW has suffered lead-based exposure.

50. Plaintiff AW has suffered, and will continue to suffer, lifelong damages including:

   a. Past medical costs related to the elevated blood levels and ongoing illnesses related to same,

   b. Future medical costs related to her injuries which will continue to accrue for the remainder of her natural life,

   c. Impairment of her physical development,

   d. Impairment of her psychological and intellectual development,

   e. Loss of lifelong earnings capacity,

   f. Loss of enjoyment of life and social pleasures,

   g. Significant, ongoing physical pain and suffering,

    **h.** Attorney's fees in bringing this action,

    **i.** Expert's fees in pursuing this claim.

## COUNT 2: BREACH OF STATUTORY LEASE COVENANT
*In Violation of MCL § 554.139*

51. Plaintiff repeats and re-alleges the factual statements and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

52. Michigan statute provides, with respect to any lease of residential premises, that "[i]n every lease or license of residential premises, the lessor or licensor covenants … [t]hat the premises and all common areas are fit for the use intended by the parties" and "[t]o keep the premises in reasonable repair during the term of the lease or license, and to comply with the applicable health and safety laws of the state and of the local government where the premises are located, except where the disrepair or violation of the applicable health or safety laws has been caused by the tenants willful or irresponsible conduct or lack of conduct." MCL § 554.139. A party injured by a landlord's failure to properly maintain the premises and common area may maintain a claim for resulting damages against the landlord. *Benton v. Dart Properties,* 270 Mich.App. 437 (2006).

53. 207 2nd Street was a residential premises, as that term is contemplated by the statute.

54. The Defendants were "lessors" and/or the "licensors" of 207 2nd Street.

55. Plaintiff AW was a tenant of 207 2nd Street. She was listed personally in the lease documents for the space.

56. Defendants failed to inspect the premises to insure that it was free from toxic lead hazards. There was lead paint and lead dust all throughout 207 2nd Street, particularly in AW's bedroom and in the surrounding soil. In so doing, the Defendant failed to keep the premises and common areas in a condition fit for the use intended by the parties.

57. Michigan's Lead Abatement Act (MCL § 333.5451 *et seq*) provides that a property manager, housing commission, or owner of a rental unit may not rent, or continue to rent, a residential housing unit to a family with a minor child if the property manager or owner had prior actual knowledge that the rental unit contains lead-based paint. Defendants' agent, Heather Moe, knew of the lead in the house and continued to rent to minor AW for 90 days thereafter. As such, Defendants violated MCL § 333.5451 in renting the property to AW and, therefore, failed to conform to the applicable health and safety laws of the state in so doing.

58. Defendants failed, as noted in Count 1, to provide Plaintiff with an approved lead-base paint hazard disclosure form prior to consummating her lease. This violated 42 USC § 4852d and therefore again failed to conform to the applicable health and safety laws applicable in the state.

59. As a result of Defendants' willful failure to disclose, Plaintiff AW has suffered lead-based exposure.

60. She has suffered, and will continue to suffer lifelong damages including:
    a. Past medical costs related to the elevated blood levels and ongoing illnesses related to same,
    b. Future medical costs related to her injuries which will continue to accrue for the remainder of her natural life,
    c. Impairment of her physical development,
    d. Impairment of her psychological and intellectual development,
    e. Loss of lifelong earnings capacity,
    f. Loss of enjoyment of life and social pleasures,
    g. Significant, ongoing physical pain and suffering,

      **h.** Attorney's fees in bringing this action,

      **i.** Expert's fees in pursuing this claim.

**COUNT 3: PREMISES LIABILITY**
*Michigan Common Law*

61. Plaintiff repeats and re-alleges the factual statements and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

62. In the State of Michigan parties to a residential lease, and their guests, enjoy the status of business invitees to whom "the highest level of protection imposed under premises liability law" is imposed. *James v. Alberts,* 464 Mich. 12, 20 (2001). As the property owner in control of the premises, a defendant owes its business invitees a duty to inspect the premises for hazards that might cause injury. *Id.; see also Price v. Kroger Co. of Michigan*, 284 Mich. App. 496, 500 (2009).

63. Defendants were Plaintiff's landlord as to the premises, 207 2nd Street.

64. Defendants had a duty to warn Plaintiff AW of any known hazards in the premises.

65. Defendants failed to warn Plaintiff AW of the known hazard: toxic lead dust throughout the premises.

66. Defendants had a duty to inspect the premises and identify any known hazards.

67. Defendants failed in this duty by failing to inspect 207 2nd Street for lead prior to renting to Plaintiff.

68. It was reasonably foreseeable that allowing a 2-month-old child to inhabit a toxic-lead brownfield site like 207 2nd Street could, and likely would, result in her incurring a blood lead content, and result in a lead toxicity.

69. Plaintiff AW did, in fact, develop blood lead toxicity.

70. Plaintiff AW's blood lead toxicity was caused, in substantial part, by Defendants' negligence.

71. As a result of Defendants' willful failure to disclose, Plaintiff AW has suffered lead-based exposure.

72. Plaintiff AW has suffered, and will continue to suffer, damages including:

    a. Past medical costs related to the elevated blood levels and ongoing illnesses related to same,

    b. Future medical costs related to her injuries which will continue to accrue for the remainder of her natural life,

    c. Impairment of her physical development,

    d. Impairment of her psychological and intellectual development,

    e. Loss of lifelong earnings capacity,

    f. Loss of enjoyment of life and social pleasures,

    g. Significant, ongoing physical pain and suffering,

    h. Attorney's fees in bringing this action,

    i. Expert's fees in pursuing this claim.

**COUNT 4: NEGLIGENCE**
*Michigan Common Law*

73. Plaintiff repeats and re-alleges the factual statements and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

74. Heath Moe was an agent and employee of Defendants at the time of the events described in this complaint.

75. Moe's regular job duties included leasing properties owned and/or managed by the Defendants, including 207 2nd street, collecting rent and remuneration for said rental spaces, and inspecting and maintaining same.

76. Heather Moe knew, or with reasonable diligence should have known, that there was significant lead paint, lead dust, and lead contamination at 207 2nd Street.

77. Heather Moe knew that Coszetta Steele intended to occupy the space with AW, a three-month-old child.

78. It was reasonably foreseeable that exposing a 3-month-old child to lead dust could result in serious, life-long injury.

79. Moe was acting as a landlord to Plaintiff AW and her mother, Coszetta Steele.

80. As a landlord, Moe had duties imposed by statute, as described previously, to inform Plaintiff of lead-based paint hazards, to inspect, remedy, and repair premises that had same. She was also statutorily prescribed from renting lead-laden property to families with minor children.

81. Despite all of this, Heather Moe allowed Coszetta Steele to occupy 207 2nd Street with minor AW.

82. Moe violated the common law duty to act with reasonable care.

83. Moe violated statutorily imposed duties and is liable for the resulting damages pursuant to the doctrine of *negligence per se*.

84. When Moe did so, she was acting within her employment with the Defendants, and in furtherance of their interests.

85. The Defendants failed to properly supervise and train Defendant Moe to prevent her from engaging in such behavior.

86. The Defendants are liable for Moe's actions by reason of Michigan's doctrine of *respondeat superior.*

87. Plaintiff AW has suffered, and will likely continue to suffer, damages including:

    a. Past medical costs related to the elevated blood levels and ongoing illnesses related to same,

    b. Future medical costs related to her injuries which will continue to accrue for the remainder of her natural life,

    c. Impairment of her physical development,

    d. Impairment of her psychological and intellectual development,

    e. Loss of lifelong earnings capacity,

    f. Loss of enjoyment of life and social pleasures,

    g. Significant, ongoing physical pain and suffering,

    h. Attorney's fees in bringing this action,

    i. Expert's fees in pursuing this claim.

## PRAYER FOR RELIEF

WHEREFORE, and for the reasons fully stated herein, the Plaintiffs hereby request the following relief:

1. Compensatory damages in an amount sufficient to compensate the losses and damages described herein,

2. Statutory treble damages, pursuant to 42 USC § 4852(b)(3),

3. Costs, expert's fees, and attorney's fees for this action pursuant to 42 USC § 4852(b)(4), and

4. Such other relief as this Court may deem appropriate in Law or in Equity.

## PLAINTIFF DEMANDS A JURY TRIAL

Respectfully Submitted,

Dated: 2/27/2020

/s/ Collin H. Nyeholt
Collin H. Nyeholt (P74132)
Attorney for the Plaintiffs